**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

JANE DOE (E), AN INDIVIDUAL
Plaintiff

v.

HEARTLAND IVY PARTNERS, LLC, a/k/a and f/k/a HEARTLAND INVESTORS, INC. d/b/a HOTEL IVY; IVY EQUITY PARTNERS LLC d/b/a HOTEL IVY; and WISCHERMANN PARTNERS, INC.

Defendants

CIVIL ACTION NO: ________________

## ORIGINAL COMPLAINT

COMES NOW Plaintiff Jane Doe (E), by and through the undersigned counsel, and respectfully submits her Original Complaint for damages.

## SUMMARY

1. This case arises from the sex trafficking of Jane Doe (E) who was repeatedly trafficked at the Hotel Ivy when she was only 16.

2. Jane Doe (E) was one of several victims of a sex trafficking scheme perpetrated by Anton "Tony" Lazzaro from the spring through the fall of 2020 at the Hotel Ivy where Lazzaro owned a condominium.

3. Defendants are the entities who acted individually, jointly, and collectively to own, operate, supervise, manage, and control the Hotel Ivy.

4. Defendants had a business relationship with Lazzaro through which they received financial benefit from giving him access to common facilities and amenities and providing him services at the Hotel Ivy on an ongoing basis.

5. The services that Defendants provided assisted Lazzaro in carrying out his sex trafficking scheme.

6. Defendants knew or should have known that Lazzaro was using the Hotel Ivy, and the services Defendants provided, to facilitate the trafficking of multiple minor girls, including Jane Doe (E).

7. Defendants continued engaging in this business relationship with Lazzaro and providing these services despite actual or constructive knowledge of Lazzaro's illegal trafficking activities.

8. Defendants had every opportunity to disrupt Lazzaro's trafficking of minor girls, including Jane Doe (E). Instead, Defendants continued engaging in conduct that facilitated Lazzaro's illegal trafficking activities.

9. As a result, Jane Doe (E) and other minor girls experienced significant harm at the Hotel Ivy.

10. Jane Doe (E) thus brings federal law claims against Defendants under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, *et seq.*, and the Childhood Abuse Victims Recovery Act ("CAVRA"), 18 U.S.C. § 2255. She also brings claims against Defendants under Minnesota law for premises liability and negligence.

## PARTIES

11. Jane Doe (E) is a natural person, born in 2004, who is currently a resident and citizen of Minnesota.

12. Jane Doe (E) is a victim of sex trafficking within the meaning of 18 U.S.C. §1591 and §1595 because traffickers recruited, solicited, enticed, provided, harbored, and patronized her knowing that she would be caused to engage in commercial sex while still a minor.

13. "Jane Doe (E)" is a pseudonym. Given the nature of the allegations in this lawsuit, there is a collective, recognized, and compelling interest in not publicly revealing the identity of Jane Doe (E). After filing this lawsuit, Jane Doe (E) will seek permission from the Court to proceed under a pseudonym and for other protections for her identity.

14. Defendant Heartland Ivy Partners LLC a/k/a and f/k/a Heartland Realty Investors, Inc., ("Heartland") is and was at all material times a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.

15. Defendant Ivy Equity Partners, LLC, ("Ivy Equity") is and at was at all material times a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.

16. Defendant Wischermann Partners, Inc., ("Wischermann") is and was at all material times a Minnesota corporation with its principal place of business in Excelsior, Minnesota.

17. Upon information and belief, at all relevant times Ivy Equity was wholly owned by and controlled by Heartland.

18. Upon information and belief, at all relevant times Heartland acted with and through Ivy Equity to own, control, operate, oversee, and control the Hotel Ivy.

19. Upon information and belief, at all relevant times Wischermann managed the hotel at the Hotel Ivy pursuant to an agreement with Heartland and Ivy Equity.

20. Upon information and belief, Heartland and Ivy Equity and Wischermann shared in profits generated from the Hotel Ivy.

21. Upon information and belief, at all relevant times, Heartland, Ivy Equity, and Wischermann (collectively "Defendants") acted—individually, jointly, and and collectively—to operate, supervise, manage, and control the Hotel Ivy property, including the hotel and services for the condominium residents like Lazzaro.

## JURISDICTION AND VENUE

22. This Court has jurisdiction under 28 U.S.C. § 1331 because this action involves a federal question.

23. The Court has jurisdiction under 18 U.S.C. § 1595, which authorizes any victim of a TVPRA violation to bring a suit in an appropriate district court of the United States.

24. The Court has jurisdiction under 18 U.S.C. § 2255, which authorizes any person who was a victim of a violation of 18 U.S.C. § 1591 while a minor to sue in any appropriate district court of the United States.

25. The Court also has supplemental jurisdiction over Jane Doe (E)'s claims under Minnesota state law because these claims arise out of the same nucleus of operative facts as her federal claims.

26. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district in Hennepin County, Minnesota.

## FACTS

### I. Background on the Hotel Ivy.

27. Jane Doe (E)'s trafficking during the fall of 2020 occurred at the Hotel Ivy, located at 201 S. 11th Street, Minneapolis, MN 55403.

28. The Hotel Ivy is a commercial building in downtown Minneapolis that includes both a luxury hotel and luxury condominiums.

29. At all relevant times, Lazzaro owned a luxury condominium on the 19th floor of the Hotel Ivy.

30. At all relevant times, Defendants employed staff at the Hotel Ivy who provided services both to hotel guests and to condominium residents.

31. Upon information and belief, services that Defendants provided to Lazzaro at the relevant time included valet, security, maintenance, room service, dry-cleaning, housekeeping, package delivery, guest screening, and other concierge services.

32. The Hotel Ivy maintained a staffed front desk that provided services both to hotel guests and condominium residents.

33. Upon information and belief, by the time of his sex trafficking scheme, Lazzaro had lived in the Hotel Ivy for approximately two years and was well known to Defendants, including to the Hotel Ivy staff.

34. Upon information and belief, Lazzaro frequently interacted with the Hotel Ivy staff, including the valet, the front desk staff, and management staff.

35. As further explained below, the Hotel Ivy property and the services provide by the Hotel Ivy staff were integral to Lazzaro's sex trafficking scheme, including to his trafficking of Jane Doe (E).

## II. Lazzaro used a common *modus operandi* to traffic minor girls, including Jane Doe (E), between the spring and fall of 2020.

36. Between the spring and fall of 2020, Lazzaro conspired with his associate, Gisela Castro Medina, to sex traffic multiple minor girls.

37. Upon information and belief, after meeting Medina, 18, online on a "sugar daddy" website, Lazzaro paid her more than $50,000.00 to identify young girls who would have sex with him for money.

38. Medina testified that Lazzaro specifically asked for her to serve as his "recruiter."

39. Upon information and belief, Lazzaro instructed Medina about his preferences for his victims: young girls with a specific physical appearance. Thus, most of Lazzaro's victims were of similar age and shared noticeable physical characteristics.

40. Upon information and belief, Medina would identify young girls matching Lazzaro's preferences through social media, get Lazzaro's approval on their appearance, and then reach out and tell them that her "sugar daddy" was interested in them and describe the benefits that Lazzaro could provide.

41. Upon information and belief, Medina would then connect the girls directly to Lazzaro through social media where Lazzaro would groom the girls.

42. Between the spring and fall of 2020, Lazzaro repeatedly and routinely solicited and enticed young girls come to his condominium at the Hotel Ivy where he had them engage in sexual acts in exchange for money and gifts.

43. Upon information and belief, and based on testimony of Lazzaro's victims at his criminal trial, Lazzaro followed consistent and routine patterns in trafficking these young girls at the Hotel Ivy, including:

a. After being connected with the girls, Lazzaro would groom them, emphasize his wealth, and arrange for them to come to his condominium at the Hotel Ivy.

b. Lazzaro would instruct the girls that, upon arrival to the Hotel Ivy, they should go to the front desk and tell the staff at that she was there to see "Tony in #1920."

c. As further discussed below, the Hotel Ivy staff would screen the visitors and deliver the girls to Lazzaro's condominium.

d. Once the girls were in Lazzaro's condominium, he offered and/or provided them alcohol and/or pills and displayed his wealth. He then paid the girls with cash and other valuable items to perform sex acts for his own sexual gratification.

e. After the sex acts were done, Lazzaro would send the girls away. The girls would leave Lazzaro's condominium after a short period of time, either exiting

the building through the lobby or using a hotel room that Lazzaro arranged and paid for at the Hotel Ivy.

f. Lazzaro would then repeat the same methods and repeatedly bring the same girls back to the Hotel Ivy.

44. Through this pattern of conduct, Lazzaro and Medina recruited, enticed, solicited patronized, harbored, and maintained teenage girls knowing or in reckless disregard of the fact that Lazzaro would cause them to engage in sexual acts in exchange for money and other items.

45. The judge at Lazzaro's criminal sentencing described his scheme as "mechanical" and likened it to a "sex trafficking assembly line."

46. Jane Doe (E) was one of Lazzaro's minor victims.

47. At the time of the relevant events, Jane Doe (E) was a 16-year-old high school student and did not yet have her driver's license.

48. After identifying Jane Doe (E) through a social media post, Medina reached out to tell Jane Doe (E) that her "sugar daddy" was interested in Jane Doe (E).

49. Medina described what her "sugar daddy" had provided for her and sent pictures of Lazzaro with celebrities and politicians.

50. Medina then connected Jane Doe (E) to Lazzaro directly through the social media application.

51. Lazzaro then groomed Jane Doe (E) through ongoing communication over social media, including by making promises about what he could provide her.

52. In or around September 2020, Lazzaro met Jane Doe (E) at the mall and purchased her an expensive luxury purse. During this meeting Lazzaro repeatedly discussed Jane Doe (E) coming to his condominium.

53. While she did not go to his condominium during this initial visit, on two occasions in the fall of 2020 Lazzaro enticed Jane Doe (E) to come to his condominium at the Hotel Ivy

where he provided her with money and other valuable items in exchange for engaging in sexual acts for his sexual gratification.

54. On the first occasion, Jane Doe (E) went to the Hotel Ivy with another 16-year-old female and Lazzaro had sex with both girls in exchange for money and other items. Lazzaro provided Jane Doe (E) with hundreds of dollars in cash and with many vape pens and provided her friend, also a minor, with a new phone and cash.

55. On the second occasion, Jane Doe (E) went to the Hotel Ivy alone. Lazzaro paid her to engage in sexual intercourse with him for his own sexual gratification. She again received hundreds of dollars in cash and vape pens.

56. Lazzaro's sex trafficking scheme ended after the parents of one of Lazzaro's minor victims became suspicious and reached out to an organization that helps victims of child sex trafficking and law enforcement was notified.

57. While Lazzaro attempted to pay Medina off in order to stop her from cooperating with law enforcement, she ultimately testified against him.

58. In December 2022, Medina pled guilty to Conspiracy to Commit Sex Trafficking of Minors and Obstruction for her role in recruiting minors, including Jane Doe (E), for Lazzaro's sex trafficking scheme.

59. Five of Lazzaro's minor victims, including Jane Doe (E), also testified against him.

60. In March 2023, Lazzaro was convicted by a federal jury of five counts of Sex Trafficking of a Minor in violation of the TVPRA and one count of Conspiracy to Commit Sex Trafficking of Minors for his trafficking of Jane Doe (E) and four other minor victims.

61. Lazzaro was sentenced to 21 years in prison.

## III. The Hotel Ivy's Integral Role in Lazzaro's Sex Trafficking Scheme.

62. Between the spring and fall of 2020, Lazzaro trafficked minor girls at the Hotel Ivy on a repeated and regular basis.

63. Lazzaro was convicted for trafficking five minor girls at the Hotel Ivy; upon information and belief, each of these girls was trafficked multiple times and Lazzaro also trafficked other minor girls during this same period.

64. The Hotel Ivy property and the services provided by the Hotel Ivy staff were integral to Lazzaro's "mechanical" sex trafficking scheme.

65. Upon information and belief, Lazzaro would arrange for his victims to enter through the front door of the Hotel Ivy.

66. Upon information and belief, there was a doorman and/or valet positioned at the front door of the Hotel Ivy to greet and assist guests.

67. When Jane Doe (E) was trafficked at the Hotel Ivy, she was greeted, observed, and directed to the front desk by the Hotel Ivy doorman and/or valet.

68. Upon information and belief, the doorman and/or valet greeted, observed, and assisted each of Lazzaro's minor victims as they entered and left the Hotel Ivy.

69. Upon information and belief, the doorman and/or valet directed each of the minor girls to the front desk at the Hotel Ivy.

70. Upon information and belief, the front desk at the Hotel Ivy was staffed by Defendants' employees.

71. Upon information and belief, the uniform practice at the Hotel Ivy was that when a guest needed access to a resident's condominium, the guest had to come to the front desk first. Visitors could not access the resident condominiums without assistance from Hotel Ivy staff.

72. Upon information and belief, unless a resident had first called the front desk staff to specifically alert them a visitor was coming, the front desk staff would have to call and obtain the resident's permission before giving the guest access to the resident's condominium.

73. Thus, upon information and belief, the front desk staff was required to interact with, observe, communicate with, and obtain identifying information about each guest that arrived to visit a condominium resident at the Hotel Ivy.

74. Upon information and belief, Lazzaro consistently and uniformly instructed the minor girls that when they arrived at the Hotel Ivy they go to the front desk and ask for "Tony in #1920."

75. Upon information and belief, each of Lazzaro's victims approached the front desk and provided information, including that they were there to see "Tony," each time they arrived at the Hotel Ivy.

76. The Hotel Ivy front officer manager, who often worked evening shifts during the period of Lazzaro's trafficking scheme, testified that Lazzaro frequently had girls coming to the front desk to get access to his condominium.

77. Upon information and belief, the front desk staff would call Lazzaro and provide identifying information about the guests to obtain Lazzaro's approval to allow the girls to access this condominium.

78. On both occasions that Jane Doe (E) was trafficked at the Hotel Ivy, she interacted with the front desk staff.

79. On these occasions, Jane Doe (E) did not know Lazzaro's last name but stated she was looking for "Tony in #1920."

80. On the first occasion when Jane Doe (E) and her minor friend went to the front desk together to state they were there to see Tony in #1920," the hotel staff responded by saying "of course you are."

81. Once Jane Doe (E) identified who she was there to visit, she observed the front desk staff call Lazzaro to obtain permission for Jane (E) to visit his condominium.

82. Upon information and belief, Lazzaro's other victims heard hotel staff call and speak to Lazzaro about their arrival and obtain his permission for the minor girls to have access to this condominium.

83. One 16-year-old victim who arrived at the Hotel Ivy with her minor friend and teenage sister testified that she heard the front desk staff tell Lazzaro, "I have three beautiful women waiting here for you."

84. Upon information and belief and as corroborated by the testimony of the front office manager and Lazzaro's victims, between the spring and fall of 2020 the staff at the front desk of the Hotel Ivy repeatedly interacted with, observed, and screened each of the teenage girls coming to Lazzaro's condominium to engage in sex acts in exchange for cash and other items.

85. Upon information and belief and as corroborated by the testimony of the front office manager and Lazzaro's victims, between the spring and fall of 2020, the staff at the front desk of the Hotel Ivy repeatedly contacted Lazzaro to alert him to the arrival of guests and obtain his permission to allow the girls access to his condominium.

86. Therefore, upon information and belief, Defendants repeatedly provided guest screening and communication services that facilitated Lazzaro's use of the Hotel Ivy to traffic teenage girls.

87. Upon information and belief, once the Hotel Ivy staff had obtained Lazzaro's approval to allow the minor girls with access to his condominium, the staff continued to actively facilitate providing these girls to Lazzaro.

88. Upon information and belief, the condominium residences at the Hotel Ivy were only accessible from a private elevator, and only residents and staff of the Hotel Ivy could access and/or operate the elevator.

89. Upon information and belief, once the front-desk staff had authorization to allow a guest to go to a condominium, they had to escort the guest to the private elevator. The hotel staff would then either ride the elevator up with the guest and direct them to the condominium or use staff access to direct the elevator to the appropriate floor.

90. Lazzaro's victims testified to repeated instances of Hotel Ivy staff escorting them to the private elevator and either riding with them to Lazzaro's 19th floor and directing them to Lazzaro's condominium or using staff access to direct the elevator to the 19th floor.

91. On the first occasion that Jane Doe (E) was trafficked at the Hotel Ivy, a front desk staff member rode the elevator to the 19th floor and delivered Jane Doe (E) and her minor friend to Lazzaro's condominium.

92. On the second occasion that Jane Doe (E) was trafficked at the Hotel Ivy, a front desk staff member escorted her to the private elevator and used her staff access to direct the elevator to the 19th floor after confirming that Jane Doe (E), a teenager, knew how to get to the condominium of the much-older Lazzaro.

93. Upon information and belief, the Hotel Ivy staff repeatedly escorted each of Lazzaro's teenage victims to the private elevator and then either rode the elevator with the girls

and delivered them to Lazzaro's condominium or used their staff access to direct the elevator to the 19th floor.

94. Upon information and belief, each of Lazzaro's victims would stay at his condominium only a short time, sometimes as short as 35 minutes.

95. On many occasions, after these short stays, the victims would then use the same private elevator and then wait in the lobby for transportation where the same staff members would be present at the front desk and the front door.

96. Upon information and belief, on other occasions, Lazzaro would arrange for these teenage girls to stay for a night at the Hotel Ivy hotel.

97. Upon information and belief, the same staff at the front desk of the Hotel Ivy who repeatedly delivered the teenage girls to Lazzaro's condominium would also work with Lazzaro to arrange hotel rooms.

## IV. Defendants knew or should have known that Lazzaro was using the Hotel Ivy for his sex trafficking scheme.

98. Defendants, including through the Hotel Ivy staff they employed, knew or should have known that Lazzaro was using the Hotel Ivy for the sex trafficking of minors, including Jane Doe (E).

99. As further described throughout this Complaint, Lazzaro operated using a consistent and "mechanical" *modus operandi* when trafficking young girls at the Hotel Ivy; this consistent pattern of conduct resulted in prevalent and obvious signs of his illegal activity, which staff at the Hotel Ivy observed.

100. Upon information and belief, Defendants and their Hotel Ivy staff had been educated and trained on recognizing sex trafficking and, therefore, were well positioned to recognize the obvious signs of Lazzaro's trafficking activities at the Hotel Ivy.

101. Since 2018, Minnesota law has required that hotel and motel employees are trained on recognizing signs of sex trafficking.

102. The front office manager of the Hotel Ivy testified that she and other staff members were trained to recognize signs of sex trafficking.

103. Because of the integral role that the Hotel Ivy played in Lazzaro's sex trafficking scheme, the staff at the Hotel Ivy frequently interacted with and observed Lazzaro's teenage victims.

104. The front office manager testified that staff at the front desk could see all activity in the lobby of the Hotel Ivy.

105. Girls between the ages of 15 and 17 repeatedly arrived asking for access to Lazzaro's condominium.

106. The Hotel Ivy staff had a reasonable opportunity to observe these victims.

107. Upon information and belief, Lazzaro's victims appeared consistent with their age.

108. The front office manager at the Hotel Ivy testified that the girls who arrived to see Lazzaro looked younger than 19 and looked closer to 16 or 17.

109. Upon information and belief, Defendants, including through their Hotel Ivy staff, were familiar with Lazzaro and frequently interacted with him.

110. Upon information and belief, Defendants, including through their Hotel Ivy staff, knew that Lazzaro was an adult man, significantly older than his minor guests.

111. Upon information and belief, the girls who Lazzaro trafficked at the Hotel Ivy were selected and recruited based on Lazzaro's preferences. Thus, they all had similar physical characteristics.

112. Upon information and belief, the similar physical profile of these girls was noticeable and was observed by staff at the Hotel Ivy.

113. The Hotel Ivy front office manager testified that "everyone" at the Hotel Ivy knew that Lazzaro had a "type."

114. The Hotel Ivy front office manager testified that Lazzaro frequently had girls arrive to see him who matched this physical type.

115. Upon information and belief, this pattern was sufficiently obvious that the hotel staff would know that the girls were coming to see Lazzaro upon sight. The front office manager testified that "when I see the girls, I can tell like they are coming to him."

116. The front office manager testified that the girls that came and went from Lazzaro's condominium did not look like his "girlfriends."

117. Upon information and belief, the girls were dressed inappropriately for their age.

118. The girls who Lazzaro trafficked at the Hotel Ivy often arrived in groups with other teenage girls.

119. The girls who Lazzaro trafficked at the Hotel Ivy were often dropped off late at night or in the middle of the night.

120. Several of Lazzaro's victim testified to repeatedly arriving at the Hotel Ivy after 10:00 pm and sometimes even after midnight.

121. Upon information and belief, some of Lazzaro's victims were picked up from slumber parties after parents were asleep and, therefore, would repeatedly arrive at the Hotel Ivy in the late night or early morning hours.

122. The arrival of minor girls to visit the condo of an adult man in the middle of the night is an obvious red flag of sex trafficking that Hotel Ivy staff repeatedly observed.

123. Upon information and belief, the Hotel Ivy staff observed a pattern of these young girls referring to Lazzaro only as "Tony" and by his apartment number without knowing his last name.

124. Upon information and belief, the Hotel Ivy staff noticed that a pattern where these young girls would only stay in Lazzaro's condominium for a short period.

125. Lazzaro's victims repeatedly testified to remaining in his condominium for only a short period and then leaving shortly after they were paid to perform sex acts.

126. After leaving Lazzaro's condominium, these victims would exit by going down through the same elevator and walking through the same lobby where they entered.

127. Upon information and belief, the same staff who provided the minor girls with access to Lazzaro's condominium would also often be present at the front desk when the girls left a short time later.

128. The Hotel Ivy staff recognized this pattern as confirmed by testimony from the front office manager who testified that the "girls" were often in Lazzaro's condominium for short periods, such as a "half hour or so."

129. The front desk staff that provided the services to condominium residents also provided services for hotel guests. Thus, upon information and belief, the front desk staff who screened the teenage girls and delivered them to Lazzaro's condominium was aware when Lazzaro arranged and paid for hotel rooms for them.

130. Part of Lazzaro's *modus operandi* was offering his teenage victims alcohol and/or prescription pills.

131. Upon information and belief, these young girls would often be intoxicated in the lobby while observed by and/or interacting with Hotel Ivy staff.

132. Several of Lazzaro's victims testified to entering the lobby while intoxicated on alcohol and/or illicit prescription drugs that Lazzaro provided them.

133. Upon information and belief, on one occasion, a group of 3 minor girls left Lazzaro's condominium after all had consumed alcohol and were observed by hotel staff in the lobby waiting for a ride. One of the girls was so intoxicated that she could not control her body or walk in a straight line.

134. Upon information and belief, another one of Lazzaro's 16-year-old victims sometimes became so intoxicated that Lazzaro escorted her to the lobby where she would struggle to walk and lean on Lazzaro. At one point, she was carried on Lazzaro's back because she struggled to walk.

135. Upon information and belief, while this 16-year-old victim was intoxicated in the lobby waiting for a ride that Lazzaro arranged, Lazzaro struck up a conversation with Hotel Ivy staff and told them that the girl was ok and that she had been drinking.

136. Upon information and belief, prior to Jane Doe (E)'s trafficking at the Hotel Ivy, the staff was specifically informed of Lazzaro's trafficking activities by one of his victims and that victim's father:

a. This 16-year-old victim was at Lazzaro's condominium with her teenage sister when she had a dispute with Lazzaro who kicked her out of his condominium. Her teenage sister remained in the condominium.

b. After being kicked out of Lazzaro's condominium, this minor victim approached the front desk and told them about Lazzaro's sex trafficking and specifically about he paid girls and provided them with valuable items in exchange for sex acts. She said that her sister was still in Lazzaro's condominium, and that staff needed to remove her. Staff responded by staying there was nothing they could do.

c. Later that same night, the minor victim's father arrived and pled with staff to help him remove his teenage daughter. Again, staff said there was nothing they could do.

137. The pattern of Lazzaro's trafficking activity was sufficiently persistent and obvious that Hotel Ivy staff knew or at least should have known that Lazzaro was using the Hotel Ivy and its services to facilitate sex trafficking of minors.

138. Upon information and belief, Defendants employed security staff who monitored common areas at the Hotel Ivy and observed these obvious signs of illegal trafficking activity.

139. The knowledge of the Hotel Ivy staff is imputed to Defendants based on the existence of an agency relationship.

140. In addition, Defendants are charged with constructive knowledge of Lazzaro's sex trafficking activity because if they had exercised ordinary prudence under the circumstances, they would not have continued facilitating this illegal activity at the Hotel Ivy.

## V. Defendants knew or should have known that Lazzaro was using the Hotel Ivy for the sex trafficking of Jane Doe (E).

141. Defendants, including through their Hotel Ivy staff, also knew or should have known Lazzaro was using the Hotel Ivy to traffic Jane Doe (E).

142. By the time that Jane Doe (E) arrived at the Hotel Ivy in the fall of 2020, the Hotel Ivy staff had already observed the above-described pattern of activity consistent with Lazzaro's "mechanical" and "assembly line" mode of sex trafficking.

143. When she arrived at the Hotel Ivy in fall 2020, Jane Doe (E) was only 16 and it was apparent that she was a teenager and a minor.

144. Each time Jane Doe (E) was trafficked at the Hotel Ivy, she repeatedly interacted with and was observed by Hotel Ivy staff.

145. On both occasions, Jane Doe (E) was observed by the doorman and/or valet when entering and exiting the Hotel Ivy.

146. On both occasions, Jane Doe (E) approached the front desk staff and specifically told them she was there to see "Tony in #1920."

147. Upon information and belief, by the time that Jane Doe (E) arrived at the Hotel Ivy, staff recognized her and her minor friend as part of Lazzaro's pattern.

148. Upon information and belief, it was apparent that Jane Doe (E) and her minor friend both fit Lazzaro's "type" that the front officer manager testified that "everyone" at the Hotel Ivy knew about.

149. When Jane Doe (E) told the front desk that she and her minor friend were there to see Lazzaro, the response was "of course you are."

150. On both occasions, Jane Doe (E) hotel staff escorted Jane Doe (E) to the elevator and provided her access to the private elevator to Lazzaro's condominium.

151. On the second occasion, the hotel staff knew that Jane Doe (E), a teenage girl, already knew how to find Lazzaro's condominium on her own, and thus did not ride the elevator up with her.

152. On both occasions, the front desk staff saw Jane Doe (E) back in the lobby after only short periods in Lazzaro's condominium.

153. Upon information and belief, by the time that these events occurred, the Hotel Ivy staff had already received a report from one of Lazzaro's other victims about his sex trafficking activities.

154. Based on the pattern of Lazzaro's conduct that they had previously observed, their preexisting knowledge, their training on sex trafficking, and the totality of the circumstances surrounding Jane Doe (E)'s trafficking, the Hotel Ivy staff knew or should have known about Jane Doe (E)'s sex trafficking at the Hotel Ivy.

155. The knowledge of the Hotel Ivy staff is imputed to Defendants based on the existence of an agency relationship.

156. In addition, Defendants are charged with constructive knowledge of Jane Doe (E)'s sex trafficking based on their failure to respond with ordinary prudence in the face of obvious obvious signs of Lazzaro's sex trafficking activities at the Hotel Ivy.

## VI. Defendants continued to participate in and facilitate sex trafficking despite what they knew.

157. Despite the clear indications that Lazzaro was using the Hotel Ivy and its services to sex traffic minors, Defendants, including through their Hotel Ivy staff, continued to maintain a business relationship with Lazzaro, including by providing him many services.

158. Specifically, the Hotel Ivy staff continued to provide services that they knew or should have known were facilitating Lazzaro in trafficking minor girls.

159. Despite actual or constructive knowledge of Lazzaro's illegal activities, the Hotel Ivy staff continued screen Lazzaro's minor victims, including Jane Doe (E), and contact him to alert him to their arrival.

160. Despite actual or constructive knowledge of Lazzaro's illegal activities, the Hotel Ivy staff continued to escort minor girls, including Jane Doe (E), to the private elevator to access Lazzaro's condominium.

161. Despite actual or constructive knowledge of Lazzaro's illegal activities, the Hotel Ivy staff continued to use their staff access for the private elevator to deliver the minor girls, including Jane Doe (E), to Lazzaro.

162. Upon information and belief, despite actual or constructive knowledge of Lazzaro's illegal activities, the Hotel Ivy staff continued to rent Lazzaro hotel rooms for his teenage visitors.

163. Despite actual or constructive knowledge of Lazzaro's illegal activities, the Hotel Ivy staff continued observe minor girls, including Jane Doe (E), come and go from Lazzaro's condominium after short stays without inquiring about their purpose, their welfare, or offering any assistance.

164. Upon information and belief, despite actual or constructive knowledge of Lazzaro's illegal activities, the Hotel Ivy staff continued to allow Lazzaro to send intoxicated teenagers into common spaces and to use those spaces to wait for transportation Lazzaro arranged.

165. Upon information and belief, despite actual or constructive knowledge of Lazzaro's illegal activities, the Hotel Ivy staff continued to maintain a familiar relationship with Lazzaro and created an implicit understanding that he could continue to operate his scheme without inference by (and with the assistance of) the Hotel Ivy staff.

166. Upon information and belief, Lazzaro used his luxury condominium and the allure of the Hotel Ivy property as part of his method of enticing his young victims, and Defendants facilitated this by continuing to allow him to use the Hotel Ivy for his illegal activities.

167. Defendants facilitated Lazzaro's illegal scheme by providing him with the cover of a legitimate commercial building to entice his victims and conceal his activities.

168. Upon information and belief, even after being specifically informed of Lazzaro's sex trafficking activity, the Hotel Ivy staff continued their business relationship with Lazzaro by refusing to take any remedial action or do any further investigation or inquiry.

169. Upon information and belief, Lazzaro had a pattern of using cash, gifts and other displays of wealth to get what he wanted and used this tactic on the Hotel Ivy staff who were, therefore, eager to accommodate him and keep him happy despite the obvious signs of his illegal behavior.

170. If Defendants had exercised reasonable diligence when operating the Hotel Ivy, then they would have prevented the Hotel Ivy from being used to facilitate Lazzaro's illegal sex trafficking scheme. Instead, Defendants affirmatively engaged in conduct that facilitated the trafficking of multiple teenage girls at the Hotel Ivy, including Jane Doe (E).

## VII. Defendants benefited from their ongoing relationship with Lazzaro.

171. Upon information and belief, Defendants received financial benefits by providing Lazzaro with the above-described services that facilitated his sex-trafficking scheme.

172. Upon information and belief, as a resident of a condominium at the Hotel Ivy, Lazzaro paid fees in exchanges for receiving services provided by Defendants and the staff they employed at the Hotel Ivy.

173. Upon information and belief, although some of the fees that Lazzaro paid for services at the Hotel Ivy may have initially been collected by a condo association, they were distributed to Defendants who ultimately received the benefit of Lazzaro's payments.

174. As a condominium resident, Lazzaro paid fees in exchange for use of common spaces, including amenities at the hotel.

175. Upon information and belief, although the fees that Lazzaro paid for common spaces and amenities may have initially been collected by a condo association, they were distributed to Defendants who ultimately received the benefit of Lazzaro's payments.

176. Upon information and belief, Defendants also benefited from renting hotel rooms to Lazzaro when he arranged for his minor victims to stay at the hotel.

177. Upon information and belief, Defendants, including through their Hotel Ivy staff, knew that Lazzaro was a wealthy individual who often flaunted his wealth and influence and used it to attempt to get what he wanted.

178. Upon information and belief, Lazzaro tipped Hotel Ivy staff members for providing him services, including the services described above that facilitated his sex trafficking scheme.

179. Upon information and belief, Defendants and their staff at the Hotel Ivy understood that they would receive significant benefits by maintaining an ongoing relationship with Lazzaro and by continuing to facilitate his activities at the hotel.

## CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

### I. Count I: Beneficiary Liability under §1595(a) of the TVPRA (All Defendants)

180. Jane Doe (E) incorporates all previous allegations in the Complaint as if fully set forth under this count and further alleges as follows.

181. A a victim of sex trafficking, Jane Doe (E) is entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C. §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

182. Jane Doe (E) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) because on two occasions in fall 2020, Lazzaro caused her to engage in commercial sex while she was a minor.

a. In the fall of 2020, Jane Doe (E) was 16.

b. Medina and Lazzaro recruited Jane Doe (E) and then Lazzaro groomed her, solicited her, enticed her, patronized her, and harbored her.

c. Lazzaro caused Jane Doe (E) to engage in commercial sex when he had sexual intercourse with her in exchange for cash and other goods.

d. Lazzaro was convicted by a jury of trafficking Jane Doe (E) and other victims.

183. Defendants are liable as beneficiaries under §1595(a) because they knowingly benefited from participation in a venture with Lazzaro that they knew or should have known was engaged in sex trafficking of minor girls:

a. Defendants participated in a venture with Lazzaro through an ongoing business relationship in which they provided him services, including specific services that facilitated his trafficking scheme. They also provided him with a venue—including common spaces at the Hotel Ivy—that allowed him to conduct his trafficking scheme in an efficient manner behind the veneer of a legitimate business. They also rented him hotel rooms for his victim(s). They also facilitated his operations by creating an understanding that they would not interfere with his activities but, instead, would continue to facilitate the delivery of young girls to his condominium.

b. Defendants benefited from their venture with Lazzaro through his payment for services and use of common spaces at the Hotel Ivy, from revenue generated when he rented hotel rooms for his victims, and from tips he paid to Hotel Ivy staff who provided him services. Defendants further benefited by providing Lazzaro with the services that facilitated his illegal activity because these actions kept an important, wealthy client satisfied and advanced their profitable relationship with him.

c. Defendants knew or should have known that this venture was engaged in sex trafficking based on the imputed knowledge of their agents, the Hotel Ivy staff. As described above, the Hotel Ivy staff at least should have known that that Lazzaro was using the Hotel Ivy and its services to facilitate sex trafficking of minors based on their observation of a longstanding pattern of conduct consistent with Lazzaro's "assembly line" *modus operandi*, based on their knowledge of how to detect sex trafficking, based on their frequent interactions with each of Lazzaro's victims and the "red flags" apparent during those interactions, and based on information reported to them. Further, they at least should have known that Jane Doe (E) was being trafficked because they repeatedly observed and interacted with her. They saw that she appeared like a young teenager., and they going to meet Lazzaro who they knew to be much older.

d. Defendants are also charged with constructive knowledge that this venture was engaged in sex trafficking, including the trafficking of Jane Doe (E), because they failed to exercise ordinary prudence in response to obvious signs of sex trafficking of teenage girls.

e. Defendants, including through their Hotel Ivy staff, continued to provide services that directly furthered Lazzaro's illegal sex trafficking activities even after they knew or should have known about the trafficking.

184. Defendants also knowingly benefited from participating in a commercial venture with one another operating the Hotel Ivy despite their actual or constructive knowledge that this venture was engaged in sex trafficking.

a. Defendants operated the Hotel Ivy as a common commercial undertaking that involved sharing of benefit and risk.

b. Each Defendant derived financial benefit from the operation of the Hotel Ivy and specifically from payments Lazzaro made for use of common spaces, services provided by Hotel Ivy staff, and rental of hotel rooms.

c. This commercial venture was engaged in sex trafficking because the Hotel Ivy was being used as an integral part of Lazzaro's sex trafficking scheme and because staff at the Hotel Ivy were facilitating that sex trafficking.

d. Defendants knew or should have known that their venture at the Hotel Ivy was engaged in sex trafficking, including the trafficking of Jane Doe (E), based on imputed knowledge of Hotel Ivy staff as further described throughout this Complaint.

e. Defendants are also charged with constructive knowledge that this venture was engaged in sex trafficking, including the trafficking of Jane Doe (E), because they failed to exercise ordinary prudence in response to obvious signs of sex trafficking of teenage girls at the Hotel Ivy.

185. Jane Doe (E) suffered and continues to suffer significant damages because of the sex trafficking she endured at the Hotel Ivy.

186. Jane Doe (E) is entitled to recover damages, including actual damages, punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1595(a).

## II. Count II: Liability under 18 U.S.C. § 2255 (All Defendants).

187. Jane Doe (E) incorporates all previous allegations in the Complaint as if fully set forth under this count and further alleges as follows.

188. CAVRA, in 18 U.S.C. § 2255, creates an additional remedy for any minor victim of a violation of 18 U.S.C. § 1591.

189. Defendants are liable to Jane Doe (E) under 18 U.S.C. § 2255 because, as alleged above, Defendants are liable as beneficiaries under 18 U.S.C. §1595(a), and Jane Doe (E) was a minor at the time of relevant events.

190. Jane Doe (E) suffered and continues to suffer significant damages because of the sex trafficking she endured at the Hotel Ivy.

191. Jane Doe (E) is entitled to recover damages, including actual damages and punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 2255.

**III. Count III: Premises Liability (All Defendants).**

192. Jane Doe (E) incorporates all previous allegations in the Complaint as if fully set forth under this count and further alleges as follows.

193. Upon information and belief, at all relevant times Defendants owned, controlled, supervised, managed, and oversaw at the Hotel Ivy property, including the hotel and the building containing the condominiums.

194. Defendants had a duty to use reasonable care for the safety of all persons at the Hotel Ivy.

195. Defendants had a non-delegable duty to inspect and maintain their property free of unreasonable risk of harm and to discover dangerous conditions.

196. Defendants' duty required Defendants to remedy and/or warn entrants of dangerous conditions on Defendants' property.

197. On two occasions in Fall 2020, Jane Doe (E) was a guest on Defendants' property.

198. A reasonably prudent person in Defendants' position would have discovered that Lazzaro posed an unreasonable risk of harm to minor girls entering the Hotel Ivy, including Jane Doe (E).

199. As further explained above, by the time that Jane Doe (E) arrived at the Hotel Ivy, Defendants knew or should have known that Lazzaro posed a dangerous condition on their property due to his "assembly line" approach of using the Hotel Ivy to traffic minor victims.

200. When Defendants saw and interacted with Jane Doe (E), a teenage girl who was asking for "Tony in #1920," they knew or should have known that Lazzaro posed a foreseeable risk of unreasonable harm to her.

201. Defendants failed to act in a reasonably prudent manner to rectify this dangerous condition, including by:

a. Failing to alert law enforcement;
b. Failing to stop its practice of bringing minors to Lazzaro's condominium;
c. Failing to stop its practice of using staff access to a private elevator to facilitate delivery of minor victims to Lazzaro;
d. Failing to address concerns with Lazzaro;
e. Failing to stop its practice of allowing Lazzaro to use Hotel Ivy common spaces and staff services to further his sex trafficking activity;
f. Failing to warn teenage guests, including Jane Doe (E), about Lazzaro's dangerous propensities.

202. Defendants, by and through the Hotel Ivy staff, should have anticipated that minor females, including Jane Doe (E), could not have appreciated the risk, danger, and/or threat that Lazzaro posed to them.

203. Defendants, as investors in commercial real estate and members of the hospitality industry who were trained and educated on sex trafficking, should have known that they had a superior understanding of the risk of sex trafficking.

204. Jane Doe (E) suffered and continues to suffer significant damages because of the sex trafficking she endured as a result of the unreasonably dangerous condition at the Hotel Ivy.

205. Defendants are responsible for Jane Doe (E)'s damages.

**IV. Count IV: Negligence (All Defendants).**

206. Jane Doe (E) incorporates all previous allegations in the Complaint as if fully set forth under this count and further alleges as follows.

207. Upon information and belief, at all relevant times Defendants owned, controlled, supervised, managed, and oversaw the Hotel Ivy property, including the building that contained the hotel and the condominium residences.

208. Defendants engaged in affirmative conduct that increased the degree of risk to Jane Doe (E), including by taking affirmative steps to screen her upon arrival, to coordinate with Lazzaro about her arrival, and to escort and deliver her to Lazzaro's condominium.

209. By engaging in this affirmative conduct, Defendants assumed a duty of care to Jane Doe (E) to use ordinary prudence when performing these duties.

210. Upon information and belief, under Defendants' arrangement, Jane Doe (E) was required to interact with staff at the front desk and be escorted by staff to the elevator. This made Jane Doe (E) a guest of Hotel Ivy.

211. Because Jane Doe (E) was a guest at the Hotel Ivy, Defendants had a special relationship with her, which created a duty of care to protect her from known and/or reasonably foreseeable dangers.

212. Defendants breached the duty of care owed to Jane Doe (E) in numerous ways, including by:

a. Continuing to facilitate Lazzaro's activities despite knowing that, in doing so, they would subject minor victims, including Jane Doe (E), to harm;
b. Affirmatively providing Jane Doe (E) with access to Lazzaro's condominium despite the known and/or foreseeable risk;
c. Continuing its practice of bringing minors to Lazzaro's condominium;
d. Continuing its practice of using staff access to a private elevator to facilitate delivery of minor victims to Lazzaro;
e. Continuing its practice of allowing Lazzaro access to Hotel Ivy property and staff services to further his sex trafficking activity;
f. Failing to warn Jane Doe (E) of a known and/or foreseeable risk posed by Lazzaro;

g. Failing to warn to Jane Doe (E) about previous events involving Lazzaro and minor females;

h. Continuing to facilitate Lazzaro's activities without making a reasonable inspection or inquiry in the face of indica of his illegal activity;

i. Failing to address concerns with Lazzaro;

j. Failing to report suspicions to law enforcement;

k. Failing to respond appropriately considering actual reports that they had received from another of Lazzaro's victims;

l. Failing to take any steps to ascertain Jane Doe (E)'s safety or to offer assistance.

213. Defendants' breaches of their duty of care caused Jane Doe (E)'s harm because:

a. Defendants' affirmative actions were necessary to provide Lazzaro with the opportunity to harm Jane Doe (E) at the Hotel Ivy. If Defendants had not taken these actions, which they knew or should have known would subject Jane Doe (E) to an unreasonable risk of harm, then they would have prevented that harm from occurring.

b. If Defendants had acted with ordinary care, they would have disrupted Lazzaro's use of the Hotel Ivy for his sex trafficking scheme and prevented the resulting harm to Jane Doe (E);

c. If Defendants had provided Jane Doe (E) with a reasonable warning of the known and/or foreseeable risk that Lazzaro posed to minor females, they would have disrupted Lazzaro's opportunity to harm Jane Doe (E).

d. If Defendants had responded appropriately to prior notice of Lazzaro's sex trafficking activities, including the report they received from one of the victims, then they would have disrupted his sex trafficking scheme and prevented his opportunity to exploit Jane Doe (E) at the Hotel Ivy.

214. Defendants' breaches of duty were a proximate cause of Jane Doe (E)'s harm because it was reasonably foreseeable to Defendants that minor females were at a high risk of being sex trafficked by Lazzaro.

215. Jane Doe (E) suffered and continues to suffer significant damages because of the sex trafficking she endured at the Hotel Ivy and because of the negligence of Defendants as described above.

216. Defendants are responsible for Jane Doe (E)'s damages.

## V. Count V: Vicarious Liability (All Defendants).

217. Jane Doe (E) incorporates all previous allegations in the Complaint as if fully set forth under this count and further alleges as follows.

218. Upon information and belief, Defendants purposefully engaged in a series of principal-agent and/or joint venture relationships to facilitate the operation of the Hotel Ivy such that each Defendant is vicariously liable for the other Defendants and their employees.

219. Upon information and belief, Heartland wholly owned, controlled, managed, supervised, and/or otherwise directed Ivy Equity.

220. Upon information and belief, Heartland formed an agency relationship and designated Ivy Equity to act as its agent for all matters related to Hotel Ivy.

221. Thus, Heartland is vicariously liable for Ivy Equity's conduct and knowledge regarding the Hotel Ivy.

222. Heartland and Ivy Equity then, in turn, entered an agreement with Wischermann under which Wischermann would manage the Hotel Ivy as part of joint venture that involved the mutual exercise of control and sharing of profits generated from the Hotel Ivy. Thus, Defendants are vicariously responsible for one another regarding operation of the Hotel Ivy.

223. Upon information and belief, Defendants collectively were the principals of numerous employees whose duties included the operation of the Hotel Ivy, such that Defendants—collectively, individually, and jointly—are vicariously liable for the torts of the employees at the Hotel Ivy.

224. Each of the Defendants were responsible for the acts, omissions, and knowledge of the Hotel Ivy staff when operating the Hotel Ivy because these acts and omissions were committed in the scope and course of employment, because Defendants ratified these acts and omissions,

and/or because Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to them, of sex trafficking occurring at the Hotel Ivy.

## DAMAGES

225. Jane Doe (E) is entitled to compensation for personal injuries and economic damages, including:

a. Actual damages (until trial and in the future);

b. Incidental and consequential damages (until trial and in the future);

c. Mental anguish and emotional distress damages (until trial and in the future);

d. Lost earnings and lost earning capacity (until trial and in the future);

e. Necessary medical expenses (until trial and in the future);

f. Life care expenses (until trial and in the future);

g. Physical pain and suffering (until trial and in the future);

h. Physical impairment (until trial and in the future);

i. Emotional impairment (until trial and in the future);

j. Exemplary/Punitive damages;

k. Attorneys' fees;

l. Costs of this action; and

m. Pre-judgment and all other interest recoverable.

## JURY TRIAL

226. Jane Doe (E) demands a jury trial on all issues.

## RELIEF SOUGHT

WHEREFORE, Jane Doe (E) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (E) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, attorney's fees and such other and further relief to which Jane Doe (E) may, in law or in equity, show herself to be justly entitled.

4-1-25

Respectfully submitted,

**SIEBEN CAREY, P.A.**

By: ______________________
JEFFREY M. MONTPETIT (#0291249)
901 Marquette Avenue, Ste. 500
Minneapolis, MN 55402
Phone: 612/333-9762
jeffrey.montpetit@knowyourrights.com

**PROVOST ★ UMPHREY LAW FIRM**

DARREN L. BROWN (TX SBN 03108350)
MATTHEW MATHENY (TX SBN 24039040)
COLIN D. MOORE (TX SBN 24041513)
*Pro Hac Vice Pending*
350 Pine Street, Ste. 1100
Beaumont, TX 77701
Phone: 409/838-8881
Fax: 409/813-8630
dbrown@pulf.com
mmatheny@pulf.com
cmoore@pulf.com